## Lay v. Commonwealth.

(Decided December 5, 1919.)

### Appeal from Whitley Circuit Court.

1. Criminal Law—Trial—Continuance.—Where on the trial of a murder case a material witness for the defendant, who was present when the trial commenced and put under rule, disappeared during the trial and before he could be introduced as a witness, it was error under the circumstances of this case for the court not to have discharged the jury, although an affidavit of what the absent witness would say was permitted to be read.

2. Criminal Law—Evidence—Threats.—In a murder trial where the question in the case was—who commenced the difficulty, the court should permit evidence of threats by the deceased and the accused to go to the jury and also evidence of the acts and conduct of each towards the other that illustrated their state of mind.

HENRY C. GILLIS and STEPHENS & STEELY for appellant.

CHARLES H. MORRIS, Attorney General, and BEVERLY M. VINCENT, Assistant Attorney General, for appellee.

Opinion of the Court by Chief Justice Carroll—Reversing.

The appellant, Lay, under an indictment charging him with the murder of A. D. Ausbrook, was found guilty of manslaughter and his punishment fixed at confinement in the state penitentiary for six years. From the judgment on the verdict he prosecutes this appeal, complaining that many errors prejudicial to his substantial rights were committed by the trial court.

A brief statement of the facts showing the relations between Lay and Ausbrook, as well as the circumstances immediately surrounding the homicide, will be helpful to an understanding of the disposition that should be made of the chief assignment of error.

A bitter enmity had existed between Lay and Ausbrook for some months before Ausbrook was killed and threats of violence were made by one against the other; although it should be said that the record shows that the threats of Ausbrook were many times more numerous than those of Lay. At any rate they were enemies and apparently each was anticipating that he might be at any time attacked by the other. The causes that produced the bad feeling between these men, it is hardly necessary to relate.

Ausbrook was shot and killed by Lay about midnight in a soft drink establishment conducted by Pete Chappis, a Greek, in the town of Jellico. Russell Allen, Cal Bennett, and Pete Chappis, aside from Ausbrook, were the only persons in the place of Chappis when Lay came to the door for the purpose of going in. These three eye-witnesses to the tragedy each testified in substance that Ausbrook was several feet from the door when Lay opened the door and immediately began shooting at Ausbrook, who was unarmed. There is no dispute about the fact that Lay fired four shots; the first one did not strike Ausbrook, as he knocked the pistol of Lay up with his hand or arm, but the other three entered his body and a moment after the last shot was fired he fell on his back to the floor, dying in about ten minutes.

These witnesses, as well as Everett Barnhill, who was out on the street but came to the door and looked in about the time the last shot was fired, say that after Ausbrook fell to the floor Lay struck him a number of times in the face with his pistol. In short, the evidence of these witnesses made out a clear case of murder against Lay.

Lay, in his own behalf, said that he did not know Ausbrook was in Chappis' place at the time he went there on his way home for the purpose of getting a soft drink; and in relating what occurred when he was in the act of going in the place he said:

"Well, as I turned the corner going in the New York restaurant A. D. Ausbrook was in my face before I saw him and threw his hand on my right shoulder and ran his hand in his pocket and I jerked my gun like that (indicating) and cocked it as I brought it out and he caught to my left shoulder and my gun fired like that (indicating). He knocked the pistol off and it fired into the glass door and I grabbed him and he jerked me on the inside of the building trying—I was trying to get his hand out of his pocket and I jerked it back against my breast that way (indicating) and he grabbed at it with his left hand and I think it went through his hand and into his breast and I fired it again and he kept jerking me further inside the house and I jobbed him in the face with it and it fired and he fell backward."

He further testified that when he started in the door Ausbrook, who was in the room near or at the door, put his hand on his shoulder and said: "God damn you, don't you run over me;" that at the time he drew his pistol Ausbrook had his left hand on his (Lay's) shoulder and his right hand on or in his pocket and that thinking he was going to get his pistol and kill him he drew his pistol and fired.

It further appears that when the case was called for trial on the seventh day of the term Jim Moses, a witness who had been summoned for both the Commonwealth and Lay, was present; answered to his name, and was called as a witness for the defendant and put under rule with the other witnesses for the defendant to be ready when he was called. It also appears that the Commonwealth did not offer Moses as a witness and that when the defendant, Lay, began the introduction of evidence in his behalf Moses was present waiting to be called as a witness in his behalf. The introduction of evidence was not concluded on the day when the first witnesses for the defendant were examined, and on the following day, which was the ninth day of the term, the attorneys for Lay shortly before they desired to introduce Moses as a witness, discovered for the first time that on the morn-

ing of that day he had left the court house and city of Williamsburg, in which the trial was in progress.

Upon making this discovery they immediately filed the following affidavit of Lay:

"The affiant, J. S. Lay, say that he is the defendant in the above styled case; he says that he cannot safely go to trial and have the trial in this case concluded at this time, because of the absence of Jim Moses, a material witness for the defendant; that defendant has used due diligence to procure and secure the attendance of said witness, and to that end before the case was set for trial had a subpoena issued by the clerk of this court for said witness, and same was duly executed upon said Jim Moses by the sheriff or one of his deputies before the day fixed for the trial; that the Commonwealth also had said witness summoned on behalf of the Commonwealth, and that when this case was called for trial on July 21st, 1919, said witness, Jim Moses, was present in open court and answered to the call of his name as a witness for the Commonwealth, and was duly sworn as a witness for the Commonwealth, and that defendant then had said witness called on his own behalf and he was then sworn as a witness for defendant in this case, and was placed under the rule and properly admonished by the court. Defendant says that had said Jim Moses not been present on the calling of this case for trial, defendant would not have been ready for trial and would not have announced ready, but said witness being present the defendant did announce ready for trial at that time. Defendant says that on the night of July 21st, 1919, he and some of his attorneys talked fully with said Jim Moses about what he knew of the facts involved in this case, and what he would testify regarding same, and that said witness was then admonished to be sure and be present when he was called as such witness and he promised to do so, and he was informed that his evidence would be very material on behalf of defendant.

"Defendant says that on July 22nd, sometime after court convened in the morning, and before noon, he saw said Jim Moses in conversation with R. L. Pope, one of the attorneys assisting in the prosecution of this case, and saw said Pope making gestures with his hands as if very earnestly talking to said witness, and that defendant has not seen said Jim Moses since said time. He

says said witness has completely disappeared and has absented himself from this court, and was not present when called as a witness for defendant and has not since been present. He says that he first learned that said witness had absented himself about one o'clock p. m. on yesterday, July 22nd. Just before court convened for the afternoon, and that he, through his attorneys, immediately communicated this information, and all the information he had, regarding the absence of said witness, to the court, and informed the court of the importance of said witness in behalf of the defendant, and announced in open court that he could not afford to have this trial concluded without the presence of said Jim Moses and his testimony in his behalf; that he then requested the issual of warrants of arrest for said witness, and two such warrants were ordered by the court and issued by the clerk and placed in the hands of the sheriff, or a deputy sheriff, for execution; that the court said to proceed with the trial and the presence of said witness would be procured if it were possible before the trial was concluded. Pursuant thereto defendant proceeded with the production and introduction of such evidence as he had available, and that he has now introduced all such evidence except the evidence of said Jim Moses, and possible rebuttal evidence. Defendant says that said Jim Moses is not yet present in court, or in town so far as defendant is informed, and that he has no information as to his whereabouts, and defendant has exercised the greatest diligence and used every means known to him and within his power to ascertain the whereabouts of said witness and secure his attendance as a witness, and has been unable to do so. Defendant says that said Jim Moses is and has been absent without the procurement or consent of this defendant or any of his attorneys, and against his will, and by reason of conditions over which defendant had no control, and defendant does not know why said witness disappeared or is not here. He says that his motion is not made for delay, but because of the materiality of the testimony of said witness to affiant's defense herein, and that justice may be done him on his trial in this case. Affiant says that the residence of said witness is in Whitley county, Kentucky, and he believes his attendance can be procured at the present term of this court,

or at the next term thereof, but he does not know the present whereabouts of said witness.

"Defendant says that if said witness were present, he could testify, and same would be true, as follows:

"That on the night A. D. Ausbrook was killed he had been at his brother's near Jellico and came into Jellico to take the midnight train towards Corbin, and while waiting for the train said Moses went into the New York restaurant where Ausbrook was killed, and a short time before the killing, and ordered some eggs and had procured same and was eating same at the time of the killing; that about five minutes after said Moses entered said restaurant, A. D. Ausbrook came in there. Said Moses was sitting at the counter near the front end of the restaurant and on the right hand side of the door as you go in, and Ausbrook came up to the counter on the right of said Moses and asked the Greek, Pete Chappis, to loan him his pistol, and said Greek said he had no pistol; then said Ausbrook walked around to the other side of said Moses and again asked said Greek for his pistol, and received a similar reply; that said Greek and said Ausbrook then walked back into kitchen of said restaurant out of sight of said Moses; that after a while the Greek came out behind the counter and Ausbrook came out in front of the counter and walked to the door and opened the screen door and he heard said Ausbrook then say, 'God damn you, don't run over me,' and he saw this defendant at the door as if he were coming in, and saw said Ausbrook grab said Lay by the shoulder with his left hand and put his right hand in his front pants pocket and make a motion as if to draw something out of his pocket, and he then saw Lay raise his pistol and Ausbrook knocked it to one side and fired and the bullett went through the glass door which was standing open; he then saw said Ausbrook with his right hand in his pocket apparently trying to draw something out and Lay holding his hand and they were scuffling and Lay fired three more shots rapidly, just about as fast as they could be fired, and at the last shot Ausbrook fell near witness and Lay immediately walked out of the restaurant; that Lay did not walk around or to the body of said Ausbrook or strike him at all after he fell. That Ausbrook did not say a word after he said 'God damn you, don't run over me,' and that Lay never said a word

at any time. He says that there was no one in said restaurant closer to the said Ausbrook and Lay than he was at the time of said shooting, and as soon as the shooting commenced the Greek ran back into the kitchen and a man who was at the telephone also ran into the kitchen. He says that said Lay did not at any time come back into the restaurant after the shooting, and said Moses soon went out of the front door, got his train and left Jellico. He says he watched and saw everything that occurred between said Ausbrook and Lay.''

And also the following affidavit of his attorneys, Gillis, Steeley, Snyder and Bird:

''The affiants state that they are attorneys for the defendant, J. S. Lay, and that the witness, Jim Moses, is absent without their procurement or consent and against their will, and that he did not inform any of them that he was going to leave, and that they do not know where he is or why he left, and that they have read or heard read the affidavit of J. S. Lay as to what said Moses would testify if present, and that they believe same is true, from the statements made by said Moses to them; they say that the defendant cannot afford to have this trial concluded without the presence of said Moses, and that the proper force and effect of his evidence cannot be had by reading same from said or any affidavit, but that his personal presence and testimony in the presence of the jury is material to and important for said defendant.''

With the filing of these affidavits counsel for Lay moved the court to discharge the jury, which motion the court overruled, but permitted the affidavit made by Lay as to what the evidence of Moses would be if present to be read to the jury as his deposition.

It further appears that during the day the court issued a rule against Moses returnable to the first day of the next term, to show cause why he should not be punished for contempt in absenting himself from the court ''after he had been sworn and placed under the rule as a witness for the defendant.'' It might here also be said that Moses was not apprehended nor did he appear during the trial of the case, which was not concluded until the eleventh day of the term; or during that term of court; nor does the record show his whereabouts. Nor is there any fact or circumstance in the

record tending in any manner to show that Lay or his counsel or any person acting for either had any part whatever in bringing about the disappearance of Moses. The causes that influenced him to leave under the circumstances stated are not disclosed by the record.

The trial of this case was not had at the indictment term and under ordinary circumstances it would not be reversable error for the court to compel the defendant to go to trial in the absence of a witness who did not appear in answer to a summons or who absented himself after the trial had commenced; if an affidavit of what he would testify to if present was permitted to be read as his deposition; but under all the facts and circumstances appearing in this record we are of the opinion that it was prejudicial error not to discharge the jury when the motion for that purpose, supported by the affidavits, was made; or to have postponed the trial until it could be certainly ascertained that Moses could not be produced, and when this appeared, to discharge the jury.

It will be at once seen that the evidence of Moses was extremely important and material to Lay, as it supported in every substantial particular his version of the circumstances attending the homicide.

The absence of Moses, who, we must presume, would have given the testimony set forth in the affidavit of Lay, left the evidence of Lay as to what happened at the time of the killing entirely unsupported except by the affidavit, and in one particular by a witness named Douglas who was out in the street. Douglas, however, was absent in the army and for this reason, being unable to be present, his deposition was taken by Lay and read on the trial.

The evidence of the three eyewitnesses to the killing who testified for the Commonwealth was, as we have said, extremely damaging to Lay, and if Lay had been supported by the evidence of Moses, given in person to the jury, it is at least possible that a different verdict would have been returned.

It is true the affidavit of Lay was read as the evidence of Moses but every lawyer at all familiar with jury practice knows that the evidence of a witness given to the jury in the form of an affidavit made by the defendant is not nearly so effective as the testimoney of the witness in person would be. If, however, the per-

sonal attendance of Moses cannot be had on another trial and his deposition cannot be secured, as it may be, the defendant must go to trial on an affidavit as to what he would state if present, but he will at least not be taken by surprise on account of the absence of Moses, as he and his counsel must have been on the last trial.

It is also urged as error that the trial judge refused to permit a number of witnesses to testify concerning threats alleged to have been made by Ausbrook against Lay. On another trial the court should permit all material evidence offered, tending to establish threats either in the form of declarations or acts or conduct made by Ausbrook about or against Lay to go to the jury; and also all the material declarations, acts and conduct of Lay tending to show threats made by him against Ausbrook, or his state of feeling and mind toward Ausbrook, for the purpose of illustrating, in so far as it would do so, who commenced the difficulty that ended in the death of Ausbrook.

The evidence for the Commonwealth tended to show that Lay was the aggressor while the evidence for Lay tended to show that Ausbrook brought on the difficulty by his acts and declarations, and therefore the state of feeling existing between these two men as evidenced by their decalarations and conduct previous to the fatal meeting was admissible for the purpose of showing who commenced the difficulty.

If evidence is introduced impeaching the credibility or the moral character of any witness the court may on his own motion, and should if so requested, give the usual admonition of the purpose for which such impeaching or attacking evidence is allowed.

Wherefore the judgment is reversed with directions for a new trial not inconsistent with this opinion.